IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 19, 2015 Session

**CODY COFER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Cumberland County**
**No. 090016    David A. Patterson, Judge**

**No. E2014-01844-CCA-R3-PC – Filed September 28, 2015**

The Petitioner, Cody Cofer, appeals from the denial of post-conviction relief by the Circuit Court for Cumberland County. He was convicted of two counts of felony murder and one count of attempted especially aggravated robbery, for which he received consecutive life sentences and a concurrent twelve-year sentence. On appeal, the Petitioner argues that he received ineffective assistance of counsel at both the trial and appellate levels. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, JR., J., joined.

Gregory P. Isaacs and J. Franklin Ammons, Knoxville, Tennessee, for the Petitioner, Cody Cofer.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall A. York, District Attorney General; and Amanda Worley, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case arises from the shooting deaths of the victims, Keith Patton and William Asher, during a home invasion on November 7, 2008, in Crab Orchard, Tennessee. As a result, the Cumberland County Grand Jury indicted the Petitioner for two counts of felony murder and one count of attempted especially aggravated robbery. Co-defendants Alexander Carino, Joshua Hutson, and Amanda Spence were also implicated for their participation in these offenses. A full recitation of the underlying facts can be found in this Court's opinion on direct appeal. See State v. Cody Cofer, No. E2011-00727-CCA-

R3-CD, 2012 WL 3555310, at *1-14 (Tenn. Crim. App. Aug. 20, 2012), perm. app. denied (Tenn. Dec. 10, 2012).

The evidence at trial established that on November 7, 2008, a group of people had gathered at Patton's residence after a birthday dinner at a local restaurant. Id. at *1. Five individuals, including Patton and Asher, were seated in the living room when two armed men entered Patton's home and demanded money. Id. The first man who entered the room was significantly taller and carried an assault rifle. The second man was armed with a pistol. Both intruders were dressed in black and wearing masks and gloves. Id. at *2. When Patton stood up from his chair and approached the men, they began to fire their weapons. Id. After the shooting, a third masked man appeared at the doorway to see what had happened. The man armed with the pistol ordered the third man to "get out there and watch out." Id. Patton was lying on the floor with visible gunshot wounds, and Asher remained on the couch gasping for air. Id. at *2-3. The intruders fled the scene in what appeared to be a black Kia. Id. Eyewitnesses were unable to identify the race of the three masked men. Id. at *2.

At trial, the State presented co-defendants Joshua Hutson and Amanda Spence as key witnesses. See id. at *4-7. Hutson testified that on the evening of November 7, 2008, his girlfriend at the time, Anna Claire Daniels, drove him to a Taco Bell in Oak Ridge to meet with the Petitioner and Alexander Carino. Id. at *4, *7. The Petitioner then drove with Carino and Hutson to Cumberland County in a "dark colored four door Kia" and Daniels returned to Knoxville. Id. According to Hutson, Daniels was not involved in the plan, but she was aware that the three men were going to rob someone. Id. at *4.

On the way to Cumberland County, the men stopped at the Petitioner's home in Kingston to retrieve black clothing. Id. at *4, *8. After arriving in Cumberland County, the men drove to Amanda Spence's home where they discussed the robbery. Id. at *4. Spence knew the location of Patton's home and provided the men with a diagram of the layout of the residence. Id. Hutson then drove the Kia and took Carino and the Petitioner to Patton's home. He parked in Patton's driveway as Carino entered the home first, armed with an assault rifle, followed by the Petitioner, who was carrying a pistol. Id. After the shooting, Hutson fled on foot through the woods. He had both his own and Carino's cell phone and keys in his possession, and he attempted to call Daniels. Id. at *4-5. He was able to reach the Petitioner, who was with Carino. The Petitioner informed Hutson that they had left Patton's home and that Spence would pick him up. Id. at *5. Hutson was then arrested and taken into custody that evening. Id.

Co-defendant Amanda Spence testified that she provided information to Carino regarding Patton's home as a robbery target. Id. She knew Carino as "Reno" but she did

-2-

not meet the Petitioner until the night of the shooting. Throughout the day on November 7, 2008, she received several phone calls from Carino, and they communicated through text message. Id. at *6. That night, when Spence returned to her house, she saw a black four-door Kia, as well as Carino, Hutson, and the Petitioner. Id. About thirty minutes to an hour after the three men went to Patton's residence, Spence received an incoming call on her cell phone from an "865" number. Id. When she answered the phone, the Petitioner yelled that things did not go as planned. He also told her to pick Hutson up from Patton's home. Spence testified that she could recognize the Petitioner's "distinct accent" which was "really ghettoish." Id. When Spence called Carino, Hutson answered the phone. She said she exchanged multiple calls with Hutson and the Petitioner in a "panic type situation." Id. She informed Carino that Hutson was arrested, and Carino told her they were returning to Knoxville. The following day, Spence was arrested. Id.

The proof from the Petitioner's trial most relevant to the issues raised in his petition for post-conviction relief pertains to the testimony of Anna Claire Daniels. In its opinion on direct appeal, this Court summarized the evidence as follows:

> Anna Claire Daniels testified that she had known Hutson since the two were in sixth grade and were dating at the time of these events. Daniels said that she also knew Carino, through Hutson, and the [Petitioner], with whom she went to kindergarten. Daniels testified that, on the day of the shooting, she and Hutson spent the morning and afternoon together. At some point, she drove Hutson to a Taco Bell in Oak Ridge, Tennessee to meet the [Petitioner] and Carino. Daniels said that she returned to Knoxville while the three men planned to drive to Crossville in a black Kia. She said that "they had bad intentions" to "settle a dispute." Hutson and Daniels had contact after she dropped him off at the Taco Bell, but Hutson became "very short" and evasive as to where he was and what he was doing. Daniels said she sent a text message to Hutson, but he did not respond. Daniels said that she fell asleep at her home and, when she woke up around 11:30 p.m., she noticed she had missed several phone calls from Hutson at around 10:30 p.m. Daniels said that she suspected that "something wasn't right" when she returned Hutson's phone calls, and Hutson's cellular phone was turned off. Daniels said she then called Carino's girlfriend, Ashley Snow, and learned that the men needed a ride.

> Daniels testified that she, along with Snow and one of Snow's friends, drove to a BP gas station in Solway, Tennessee, to meet Carino and Hutson. When she arrived, however, she found Carino and the [Petitioner]. When she inquired about Hutson, she was told "they've got him." She later learned that Hutson was not there because he had been arrested. Carino and

-3-

the [Petitioner] began taking items out of the vehicle they had been driving, a red Explorer, and placing the items in Daniels['s] car. Daniels said that Carino got into her car, and the [Petitioner] left. As Daniels drove back to Hutson's apartment with Carino, Snow, and Snow's friend, she began to understand what had occurred based on the conversation in the car. Daniels recalled that she turned onto a side road in Karns by a baseball field, and Carino got out of the car. Daniels said that she was instructed to turn the car around. She did so and when she returned to where Carino had exited her car, she saw his shoes burning on the side of the road. Carino got back into the car, and Daniels drove to Hutson's apartment.

Daniels testified that, as the night progressed, she grew more concerned about Hutson and what had occurred in Cumberland County. The following day, she contacted police and provided information about Carino's location, and he was later arrested. Daniels said that she also gave a statement to police and assisted [TBI] Agent [Tommy] Calahan in finding the area where Carino burned his shoes. Daniels testified that she and Hutson were no longer in a relationship, although she had spoken with him "a couple of weeks ago."

On cross-examination, Daniels agreed that Hutson was the source of most of the information she provided to police. From Hutson, she had learned that the three men were going to "see about marijuana and possibly fifty thousand dollars." Daniels said that she dropped Hutson off at a Taco Bell to meet Carino and the [Petitioner] at 6:30 or 7:00 p.m. eastern time. Daniels said that she met the [Petitioner] and Carino at the BP gas station at around midnight eastern time.

Id. at *7-8. To further corroborate the Petitioner's participation in the shooting and robbery, the State introduced evidence that law enforcement executed a search warrant at the Petitioner's home in Kingston, Tennessee on November 10, 2008. Authorities recovered a Motorola AT&T cell phone and a pair of Nike shoes. Id. at *8. An AT&T employee testified that the subscriber of the recovered phone was "Cody Coser" and that the phone number was 865-XXX-3032. Id. at *9. Investigator Jeff Slayton of the Cumberland County Sheriff's Department testified that Hutson was apprehended first and that he had two cell phones in his possession. Hutson was the subscriber to one of the phones, and the number of the other phone was listed in his "Contacts" section as "Reno." Id. Hutson's phone also included the contact for phone number 865-XXX-3032 as "Cody C." Id. at *10. The same phone number was listed in Carino's phone as "Cofer." Id.

-4-

TBI agent Tommy Calahan interviewed Daniels on the evening of November 9, 2008. Id. at *12. He also obtained cell phone records pertaining to the Petitioner, Carino, Hutson, and Spence, and submitted the phones to TBI Technical Services for forensic analysis. Id. Agent Calahan testified extensively regarding the cell phone communication between Carino, Spence, and the Petitioner on the day of the offense. This Court summarized the State's evidence as follows:

Agent Calahan testified about text messages that were sent after the shooting. He said that these messages occurred primarily between Spence and the [Petitioner], who Spence had just met. Agent Calahan said that Spence told investigators that she did not know the [Petitioner]'s cell phone number until she received a phone call that night from an unknown number that she learned was the [Petitioner]'s number when she answered the phone call. Agent Calahan confirmed that the [Petitioner]'s cell phone number was not in Spence's list of contacts on her phone. The text messages between the [Petitioner]'s cell phone and Spence's cell phone began after the [Petitioner] placed a phone call to Spence, which occurred after the shooting. At 10:39 p.m., a text message was sent from Spence's cell phone to the [Petitioner]'s cell phone, stating "Tell Reno to call me, UMMA DO ME." Agent Calahan said this text is significant in that Hutson had Carino's cellular phone. At 3:10 a.m. on November 8, a text message was sent from Spence's cellular phone to the [Petitioner]'s cellular phone stating, "Hey, they got dude under investigative hold 'til Monday."

Agent Calahan testified that he also compiled a record of actual calls. Agent Calahan identified a phone call between Hutson and the [Petitioner] at 2:29 p.m. on November 7, 2008. The location of the cell tower used to connect the [Petitioner]'s call was in Oak Ridge, Tennessee. Agent Calahan said that this was consistent with the [Petitioner]'s text message at 3:52 p.m. to Carino that indicated he was in "Da Ridge." Agent Calahan testified that an incoming phone call at 4:09 p.m. from Hutson's cell phone indicated use of the Oak Ridge Tower, which showed the [Petitioner]'s continued presence in Oak Ridge. Agent Calahan noted that Autumn Hale, who owned the black Kia, lived in Oak Ridge. Agent Callahan summarized the contents of the cellular phone call records, explaining that few calls were placed before the homicide and the "cell phones [went] crazy" among the relevant parties after the homicide. Agent Calahan testified that the first phone call placed from the [Petitioner]'s cellular phone after the shooting was to Carino's cellular phone, which was in Hutson's possession. After the phone call to Carino's cellular phone, there were two phone calls placed to Spence's cellular phone. The cell

-5-

phone tower used to connect the call for the [Petitioner]'s phone was located in Crab Orchard, Tennessee. Phone calls continued to be placed and received from the [Petitioner]'s cellular phone, and the records indicated that the cell towers used included those in Crab Orchard, Ozone, Futrell Lane, Rockwood, Kingston, and Oak Ridge. Agent Calahan said that the record of the cell towers used indicated that the [Petitioner] left Crab Orchard after the shooting and traveled to Oak Ridge and Knoxville. Agent Calahan also noted that the records showed a "dead time," with no phone usage for thirty-eight minutes, from 8:55 p.m. to 9:33 p.m., which is the time frame of the homicides.

Agent Calahan testified that, based on his investigation, he suspected that the weapons might be located in or along the Clinch River, which runs between Cumberland County and Oak Ridge. Agent Calahan identified the Smith and Wesson .40 caliber pistol and the Nato .223 caliber assault rifle, which were recovered within feet of each other in the Clinch River, below the Highway 58 bridge. TBI testing confirmed that these two weapons were used in the homicides.

Id. at *13-14. At trial, the State also introduced evidence that on April 5, 2009, correctional officer Wilson White of the Cumberland County Sheriff's Department observed the Petitioner slip Carino a piece of paper immediately after the inmates had breakfast. Id. at *11. Correctional officers retrieved the coded note, which was deciphered for the jury as follows:

[M]an, did you not hear, they have nuttin on da car, it was clean. It wasn't up here, who went in the crib with dude, no witnesses saw a car there. The police know girl was in the area, tried to pick dude up. What's girl's name when was at Amanda's? Dud girl don't know if I came up here or not. Some witness say a n---a was in the house. Did you put the clip in the little strap? You gotta know. Did you have any text in your phone? I trashed mine. They can't place, prove I had my phone. Witnesses saw two, they think three, but not for sure. Did you get back your motion of discovery? Answer all my questions. Do you think you put the clip in that, then handed it back?

Id. at *12.

Based on the above evidence, the jury convicted the Petitioner as charged of two counts of felony murder and one count of attempted especially aggravated robbery. Id. at

-6-

*14. This Court summarized the proof presented at the Petitioner's sentencing hearing as follows:

> Danny Williams, a Board of Probation and Parole officer, testified that he prepared the investigative report for sentencing. Williams read the following statement submitted by the [Petitioner], as to his version of the events, "I let someone use my phone and they were involved in the crime of robbery and murder. No involvement, but my cell phone."
>
> Williams summarized the [Petitioner]'s criminal history, which consisted of two convictions for driving without a drivers' license, an evading arrest conviction, a driving on a suspended license conviction, a criminal impersonation conviction, a disorderly conduct conviction, and two misdemeanor convictions for marijuana possession. These offenses occurred between 2004 and 2007. Williams said that the [Petitioner]'s record indicated that three probation violations were filed but were subsequently dismissed. Williams said that, at the time these offenses were committed, the [Petitioner] had pending charges and was out of jail on bond for the sale and delivery of marijuana in Knox County. Williams said that the Knox County charges were dismissed after the [Petitioner]'s trial in this case. Williams said that the [Petitioner] admitted marijuana use since he was fifteen years old and use of ecstasy. Terry Patton, Patton's sister, read her victim impact statement at the sentencing hearing.

The trial court sentenced the Petitioner to consecutive terms of life imprisonment and a concurrent twelve-year sentence. See id. at *15.

On direct appeal, the Petitioner argued that the evidence was insufficient to establish his identity as a participant in the offenses and that the trial court erred by not declaring Anna Claire Daniels as an accomplice as a matter of law. Id. at *15, *18. The Petitioner further asserted that the trial court erred by failing to charge the jury with a missing witness instruction, that the State's closing argument was improper, and that the trial court imposed an excessive sentence. Id. at *1. This Court affirmed the Petitioner's sentences and convictions, and the Tennessee Supreme Court denied his application for permission to appeal on December 10, 2012.

On June 26, 2013, the Petitioner filed a timely pro se petition for post-conviction relief alleging the denial of effective assistance of counsel. He later filed an amended pro se petition on August 21, 2013. On December 9, 2013, the Petitioner filed a second amended petition with the assistance of counsel. The post-conviction hearing occurred on August 27, 2014.

-7-

**Post-Conviction Hearing.** At the post-conviction hearing, Anna Claire Daniels testified, in large part, consistently with her testimony at trial. She stated that she began dating Joshua Hutson in 2004 and that they ended their relationship a few weeks before the Petitioner's trial in November 2010. Daniels said that Hutson did not provide her with many details about his plans for the evening of November 7, 2008. It was her understanding that some people in Cumberland County owed Carino and the Petitioner money from a bad drug deal, and the two men needed Hutson's help. She acknowledged that the plan involved robbing someone of drugs and money.

Daniels agreed that she dropped Hutson off at the Taco Bell in Oak Ridge that afternoon and that she drove to the BP gas station in Solway at around midnight. She explained that the BP station was located between Oak Ridge and Knoxville and that she went there expecting to pick Hutson up. She said that Carino and the Petitioner placed items in her car, though she did not know what the items were. At the time, Daniels was concerned about Hutson's whereabouts. However, Carino would not disclose what had happened despite her repeated questioning. She said she let Carino out of her car at a baseball field in Karns because he was very anxious and was ordering her to do things. She turned her car around as instructed, and she denied knowing that Carino intended to destroy certain items. When Daniels asked Carino why his shoes were burning, he remained vague and just repeated that something bad had happened. She later learned that he was trying to destroy evidence related to a double homicide. She said that she testified truthfully at trial and that she answered the questions that were presented.

Daniels agreed that she did not testify at trial about going into the BP gas station that night and purchasing lighter fluid. She said that Carino and the Petitioner had ordered her to do so, and she did not recall the purchase until she read some transcripts. She was not asked about the lighter fluid at trial, and she was not interviewed by trial counsel or an investigator from his office. Daniels testified that she did not know that the lighter fluid would be used to burn shoes or other evidence. She stated that trial counsel never asked her about a surveillance video from the BP station. After viewing the surveillance video, Daniels could not identify herself. She said that her memory would not have been refreshed if she had been shown the video in 2008. She further stated that if trial counsel had interviewed her, she would have been truthful regarding what she was able to recall. Daniels said that prior to the post-conviction hearing, no one had ever questioned her about the lighter fluid.

Trial counsel testified that he began practicing law in 1981 and that he focused primarily on criminal defense. In the past decade, he had practiced mostly in court-appointed murder cases at the state level. When he was appointed to represent the Petitioner in 2008, trial counsel had tried about eighteen murder cases. He said that in

this case, he had the assistance of co-counsel and two investigators. Trial counsel stated that he personally interviewed four or five witnesses. He could not recall the names of the individuals that his investigators had interviewed. He agreed that eyewitnesses at the Patton residence were unable to identify the three perpetrators. Counsel stated that the theory of the defense was that the State lacked any direct or corroborating evidence to establish the Petitioner's identity as the second intruder in the home invasion.

Trial counsel said that he was aware that Anna Claire Daniels was an important witness for the State and that she would testify at trial. He argued at trial and on appeal that Daniels should have been declared an accomplice as a matter of law and that her testimony required corroboration. He testified that he remained disappointed that he could not convince the courts of his position. Trial counsel stated that the fact that Daniels bought lighter fluid "would not have hurt" his theory that she was an accomplice. He said that the State provided him with the BP surveillance video, but he could not recall whether the Petitioner appeared in the video. He did not want the jury to see the Solway BP video and conclude that the Petitioner was present that evening. Trial counsel recalled that his investigators interviewed the BP clerk. He said he did not interview Daniels because he already had her police statement. Trial counsel opined that Daniels's statement was critical evidence and that her testimony and recollection tended to minimize her own involvement. He testified that his decision not to interview Daniels was "tactical" and not based on neglect, and he explained his strategy as follows:

> As to not interviewing her, I had her written statement, I knew she was going to minimize what she had to say and I'd rather the jury hear from her on direct to minimizing and then use her statement, plus use Mr. Calahan as rebuttal to show that she had every incentive to minimize her involvement. Because I felt very strongly that the court was not going to declare her as an accomplice as a matter of law simply because she was not charged.

Trial counsel said he knew that Daniels went into the BP store and that the defendants used an accelerant. He did not know whether his cross-examination of Daniels would have been more effective if he had known that she had purchased lighter fluid. He disagreed that Daniels' BP purchase was "the most significant piece of evidence" to establish her status as an accomplice. He believed that her prior awareness of the criminal conduct was the most critical factor.

Trial counsel acknowledged that Hutson was represented by counsel who was also representing the Petitioner on a separate charge in Knox County. He was aware that Hutson's counsel and the Petitioner had discussed the instant case. According to trial counsel, Hutson made a statement inculpating the Petitioner before Hutson's counsel was

appointed to represent Hutson. Hutson's counsel represented Hutson from November 2008 to July 2009, and a different attorney represented Hutson at trial. Trial counsel said that he had several in-chambers discussions in General Sessions Court about this conflict of interest. Hutson's counsel stated that he sought an opinion from the Board of Professional Responsibility, and the case "languished for two or three months" while they awaited the outcome. Trial counsel said he believed that there was "an out and out conflict" but he was willing to wait for formal guidance. He had prepared a written motion raising the conflict of interest, which he sent to Hutson's counsel. However, trial counsel did not file that motion. He said he adopted the motions filed by Carino's counsel, including a motion to disqualify Hutson's counsel.

Trial counsel agreed that the handwritten coded note retrieved at the Cumberland County Jail was a significant piece of evidence for the State. He stated that he "strenuously tried to keep this [evidence] out" and objected on numerous grounds to its admission at trial. Counsel recalled that after his objection based on lack of foundation, the State "cured" the objection when the correctional officer testified that he personally observed the Petitioner pass the note to Carino. He said that his objections were overruled when he renewed them. He acknowledged that he filed a motion for new trial arguing that the coded note was improperly introduced into evidence and that the note failed to corroborate any accomplice testimony. Trial counsel said that it was his practice to raise as many grounds as possible to preserve issues for appeal. However, he did not include issues from the motion in the appellate brief if they were insignificant. He said that co-counsel handled the appeal, and the issue of the coded note may have been inadvertently omitted. He acknowledged that he signed the appellate brief as counsel of record. He believed that the defense selected and pursued the strongest arguments on direct appeal.

Trial counsel identified a motion to withdraw that he filed about two weeks before the Petitioner's trial. He testified that at the time of the motion, his relationship with the Petitioner had deteriorated to the extent that he could not effectively represent the Petitioner. Trial counsel said that "there was a significant change" in their relationship after he filed the motion and before the trial date. He stated that his difficulties with the Petitioner "evaporated" after the Petitioner stopped "receiving advice and information from third parties."

Trial counsel testified that he personally filed three or four motions on the Petitioner's behalf, and he adopted the motions filed by Carino's counsel. He acknowledged that he largely deferred to the motion practice of Carino's counsel and that he did not spend much time on the motions in this case. He agreed that there were differences in the representation of the Petitioner and of Carino. Trial counsel stated that the "main motion" he filed was a request for the State to identify corroborating evidence.

Trial counsel said that the State initially sought the enhanced punishment of life without parole for the Petitioner. As a result, the trial court approved funding for a mitigation expert to present proof in the penalty phase. After voir dire, however, the State approached trial counsel and offered to withdraw its notice of intent to seek enhanced punishment if counsel refrained from emphasizing Carino's plea deal or his status as "the ring leader." Trial counsel testified that he consulted the Petitioner and his family, and they agreed to accept the State's offer. He said he did not regret this trial strategy. He acknowledged that he did not present mitigation evidence at the Petitioner's sentencing hearing. Counsel opined that trial courts rarely align murder sentences concurrently to avoid a "free pass" for the second homicide. He said that he raised the issue of sentencing on appeal without the expectation of prevailing.

At the conclusion of the hearing, the post-conviction court denied relief after noting that post-conviction counsel did not present proof to establish prejudice to the Petitioner. The court then supplemented its oral ruling with a written order entered on September 8, 2014. In its order, the court concluded that the Petitioner failed to demonstrate either deficient performance or prejudice arising therefrom. It further noted that "the proof presented by the Petitioner does not cause this court reason to question the jury's finding of guilt beyond a reasonable doubt." The Petitioner timely appealed the post-conviction court's order.

## ANALYSIS

The Petitioner argues that he received ineffective assistance of counsel at trial and on appeal. Specifically, he asserts that trial counsel was ineffective because counsel: (1) failed to interview Anna Claire Daniels; (2) failed to properly challenge the conflict of interest involving the Petitioner and Hutson's counsel; (3) failed to raise the issue of the admissibility of the coded note on appeal; (4) failed to properly establish grounds for his motion to withdraw as the Petitioner's counsel, and further failed to raise the denial of the motion on appeal; (5) failed to file multiple pretrial motions on the Petitioner's behalf; and (6) failed to effectively represent the Petitioner during sentencing.[1] The State responds that the post-conviction court properly denied relief because the Petitioner failed to establish that he received ineffective assistance of trial and appellate counsel. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

---

[1] We have renumbered the Petitioner's issues for clarity.

-11-

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an

insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). This two-prong Strickland test applies to claims of ineffective assistance of counsel at either the trial or appellate levels. See Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995) (citing Evitts v. Lucey, 469 U.S. 387 (1985)).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**I. Pretrial Investigation of Anna Claire Daniels.** First, the Petitioner argues that trial counsel was ineffective for failing to reasonably investigate Anna Claire Daniels before trial.[2] He asserts that if counsel had interviewed Daniels, he would have discovered the full extent of her role in the criminal activity occurring on November 7, 2008. The Petitioner maintains that if trial counsel had learned that Daniels purchased lighter fluid to enable Carino to destroy evidence, counsel would have more effectively presented the argument that Daniels was an accomplice as a matter of law to the trial court. He argues that Daniels's status as an accomplice would have altered the outcome at trial because her testimony would have required corroboration. To the extent the Petitioner's claim attempts to re-litigate Daniels's status as an accomplice as raised and rejected by this Court on direct appeal, we consider this issue previously determined and

---

[2] In his second amended petition for post-conviction relief and in his brief, the Petitioner also asserts that trial counsel was ineffective for failing to interview Alexander Carino. However, this issue was not developed at the post-conviction hearing nor was it supported by argument in the brief. The issue is accordingly waived.

-13-

therefore waived. See T.C.A. § 40-30-106(f) (Issues that have been "previously determined" may not be re-litigated in a post-conviction procedure.). However, we will consider on the merits the Petitioner's claim that trial counsel was ineffective due to his failure to interview Daniels.

At the post-conviction hearing, Daniels acknowledged that she did not testify at trial regarding her purchase of the lighter fluid. She said she did not know that the lighter fluid would be used to burn evidence and that she complied with Carino's orders out of concern for Hutson's whereabouts. According to Daniels, she did not recall the lighter fluid purchase until after the trial when she read about it in some transcripts. She was unable to positively identify herself in the BP surveillance video. After Daniels learned of the double homicide in Cumberland County, she contacted the police the following day and cooperated with the authorities.

Trial counsel testified that it was the defense's position that Daniels should have been declared an accomplice as a matter of law and that she should have been charged. He stated that the fact that Daniels bought lighter fluid "would not have hurt" his theory, but he did not believe the purchase was "the most significant piece of evidence" to establish her status as an accomplice. Counsel said he made the tactical decision not to interview Daniels, because he wanted to use her police statement and Agent Calahan to show that Daniels minimized her own involvement in the events. He believed he effectively accomplished his goal of showing that Daniels minimized her role in the homicide through his cross-examination of Agent Calahan.

In its written order denying relief, the post-conviction court rejected the Petitioner's assertion that "the proof establishing his presence at the scene of the murders is solely based on the testimony of co-defendants, accomplices and Daniels, who was also an accomplice." It noted that the trial court appropriately instructed the jury that Daniels's role in the robbery was a question of fact for the jury to determine. The post-conviction court found that the testimony of Daniels and the co-defendants was corroborated by the Petitioner's cell phone records as well as the note he passed to Carino "relating [to] events occurring at the scene of the murders."

We have reviewed the record and agree with the post-conviction court's determination that the State offered independent corroborative testimony at trial to sustain the Petitioner's convictions. In other words, the Petitioner has not demonstrated that but for trial counsel's failure to interview Daniels, the outcome of the proceeding would have been different. In reaching this conclusion, we are unpersuaded that Daniels would have been declared an accomplice as a matter of law if the trial court had known of Daniels's purchase of lighter fluid. Moreover, as previously stated, we are reluctant to rehash whether Daniels was an accomplice as a matter of law because this Court

-14-

previously determined this issue on direct appeal.[3]  See Cody Cofer, 2012 WL 3555310, at *19.  Nevertheless, we are unable to conclude that trial counsel's failure to interview Daniels and learn of her purchase of lighter fluid on the night of the offense was deficient performance.

As part of their duties and criteria for representation, "a defense attorney, or his agent, should interview not only his own witnesses but also those that the Government intends to call, when they are accessible."  See Vaughn, 202 S.W.3d at 116 (internal citations and quotations omitted).  However, in this case, trial counsel testified that he had Daniels's statement to police prior to trial and realized that she was minimizing her role in the offense.  Trial counsel believed that if he had interviewed Daniels prior to trial, she would have known the questions he was going to ask and further minimize her role in the offense.  Given Daniels's testimony at the post-conviction hearing, explaining that she was forced to purchase the accelerant and that she did not know what it would be used for, we conclude that trial counsel made a legitimate tactical decision not to interview Daniels.  Tactical choices made by counsel are given deference, and the courts must not measure trial counsel's deficiency by "20-20 hindsight."  Id. at 121 (internal citations omitted).

The Petitioner argues that had trial counsel interviewed Daniels, he would have discovered that Daniels purchased accelerant on the night of the offense.  However, trial counsel aggressively argued that Daniels should have been classified as an accomplice as a matter of law based on other compelling evidence including her prior awareness that a

---

[3] This Court reasoned on direct appeal:

> The testimony at trial was that Hutson and Spence were both indicted for their participation in these crimes.  Daniels, however, was not indicted for these crimes.  Daniels testified that she drove Hutson to a Taco Bell, where he met Carino and the [Petitioner].  She knew the men had "bad intentions" to "settle a dispute," but she was unaware of the details of their plan.  Daniels testified that Hutson became evasive and "short" in their communication when she tried to learn his location and plans.  Later that night, Daniels drove to pick up Hutson at a BP gas station and found only the [Petitioner].  She inquired as to Hutson's whereabouts and was given a vague answer.  As she listened to the conversation between Carino and his girlfriend, she began to put together the events of the night and became concerned.  Based upon what she heard and her inability to contact Hutson, Daniels contacted the police and cooperated fully with the investigation.  This evidence does not indicate that Daniels, "with common intent[,] unite[d]" in the commission of these homicides and attempted robbery.  Although she did provide Hutson a ride to meet his codefendants, her role beyond that is unclear.  Thus, the trial court properly left this issue to the jury for its determination.

Cody Cofer, 2012 WL 3555310, at *19.

crime was about to occur, her involvement as the driver for the co-defendants after the double homicide, and her witnessing the destruction of evidence. While Daniels's purchase of the accelerant was certainly relevant to establishing her accomplice status, given the other evidence concerning her involvement, we cannot say that its omission would have altered the outcome of the trial. Accordingly, the Petitioner has failed to establish deficient performance or prejudice arising therefrom. He is not entitled to relief.

      **II. <u>Conflict of Interest With Hutson's Counsel.</u>** Next, the Petitioner claims that trial counsel was ineffective in failing to properly challenge the conflict of interest involving the Petitioner and Hutson's counsel. He argues that prejudice should be presumed because Hutson's counsel simultaneously represented Hutson and the Petitioner. He contends that counsel's failure to independently raise this issue harmed his defense because Hutson benefited from speaking to law enforcement first and claiming to be the individual who was outside the Patton residence at all times. In addressing this claim, the post-conviction court denied relief because the Petitioner presented no proof that trial counsel was ineffective in failing to challenge the conflict of interest involving Hutson's counsel and the Petitioner.

      Tennessee Supreme Court Rule 8 states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . the representation of one client will be directly adverse to another client[.]" Tenn. Sup.Ct. R. 8, RPC 1.7(a)(1). There is a presumption of prejudice "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that an 'actual conflict of interest adversely affected his lawyer's performance." <u>Strickland</u>, 466 U.S. at 692 (quoting <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 350 (1980)); <u>see also</u> <u>Netters v. State</u>, 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997); <u>State v. Thompson</u>, 768 S.W.2d 239, 245 (Tenn. 1989)). "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" <u>State v. White</u>, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting <u>State v. Culbreath</u>, 30 S.W.3d 309, 312-13 (Tenn. 2000) (quoting Tenn. R. Sup. Ct. 8, EC 5-1)).

      We conclude that the Petitioner failed to establish that Hutson's counsel was burdened by an actual conflict of interest. The Petitioner was required to prove that trial counsel's performance was deficient and that this deficiency prejudiced his defense. Trial counsel testified at the post-conviction hearing that he had several in-chambers discussions regarding the simultaneous representation of Hutson and the Petitioner by Hutson's counsel. During those discussions, counsel told the trial court that he believed there was "an out and out conflict." Although he drafted a motion to disqualify Hutson's counsel, he did not file it because he was willing to wait for an opinion from the Board of

Professional Responsibility. He said that Hutson's counsel was no longer representing Hutson at the time of trial. The trial record reflects that during a motion hearing on March 4, 2010, Carino's counsel argued that Hutson's counsel should be disqualified, and trial counsel adopted the motions filed by Carino's counsel. However, the trial court determined that the matter was moot because Hutson's counsel was no longer involved in the case and did not represent any co-defendants. At the post-conviction hearing, the Petitioner did not present any proof to establish a reasonable probability that an independent motion raised by trial counsel would have resulted in a different outcome, therefore he has failed to meet his burden of proof in this claim.

**III.** **Admission of the Coded Note.** The Petitioner's next claim concerns counsel's appellate representation. He alleges that counsel was ineffective in failing to challenge the admission of the coded note on direct appeal, even though the issue was included in the motion for new trial. The Petitioner contends that correctional officer Wilson White never testified that he saw the Petitioner or Carino write the note, and the State offered no evidence such as handwriting analysis to establish the author of the note. He argues that trial counsel should have objected to Agent Calahan's purely speculative testimony regarding the coded note. He further asserts that trial counsel conceded that the omission may have been inadvertent rather than a tactical.

At the post-conviction hearing, trial counsel testified that he objected to the admission of the coded note based on authentication and chain of custody. After the court sustained his objection, the State laid a foundation for the evidence. When trial counsel renewed his evidentiary objection, the trial court overruled him and admitted the note. He acknowledged challenging the admission of the note in the motion for new trial and stated that it was his practice to include as many issues as possible to preserve them for appeal. Trial counsel opined that the defense pursued the strongest arguments on direct appeal and did not include weaker issues. In rejecting this claim for relief, the post-conviction court found that "[n]o proof was shown by the Petitioner that the note was improperly admitted. No authority was cited by the Petitioner that the ruling made by the trial court was improper. The Petitioner has not shown that had [trial counsel] presented this issue to the appellate court, he would have been successful."

We agree with the post-conviction court's conclusion that trial counsel was not ineffective in this regard. Although the Petitioner faults trial counsel for failing to challenge the admission of the note on appeal, he has failed to establish that counsel's performance was prejudicial. Initially, we note that "[a]ppellate counsel are not constitutionally required to raise every conceivable issue on appeal." Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999)). Where a petitioner claims that counsel failed to raise a certain issue on appeal, this Court should consider the merits of the issue. Id.

At trial, correctional officer Wilson White testified that on the morning of April 5, 2009, he was assigned to central control where he had a clear view of all the inmates in the Cumberland County Jail. See Cody Cofer, 2012 WL 3555310, at *11. He said that he personally observed the Petitioner slip a piece of paper into the hallway as Carino was returning a breakfast tray. Based on Officer White's request, another correctional officer immediately retrieved the note from Carino and brought it back to central control. Officer White stated that the piece of paper and the other correctional officer remained visible to him at all times. He said that he recognized the note because of its torn corner. After Officer Wilson identified the evidence and established an unbroken chain of custody, it was within the trial court's discretion to admit the coded note. See, e.g., State v. Cannon, 254 S.W.3d 287, 296 (Tenn. 2008) ("[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence."); State v. Holbrooks, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998) (citing State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982)); see also Tenn. R. Evid. 901(a), (b). In our view, the facts and circumstances surrounding the coded note reasonably established its identity and integrity. Accordingly, the trial court did not abuse its discretion, and the Petitioner has made an insufficient showing that he suffered prejudice due to counsel's failure to challenge the admission of the note on appeal.

**IV. Motion to Withdraw.** The Petitioner also asserts that trial counsel failed to properly establish grounds for his motion to withdraw as counsel, and further failed to seek appellate review after the denial of the motion to withdraw. He contends that the trial court "plainly abused its discretion" in denying counsel's motion to withdraw. In dismissing this claim, the post-conviction court found no proof that trial counsel was deficient for failing to further the motion to withdraw at trial or on appeal. We conclude that the evidence does not preponderate against the post-conviction court's findings.

"[A]lthough the United States Constitution and the Constitution of Tennessee guarantee an indigent criminal defendant the right to assistance of counsel, the right does not include counsel of choice, special rapport with counsel, confidence in counsel, or even a meaningful relationship with counsel." Mobley v. State, 397 S.W.3d 70, 93 (Tenn. 2013) (citing State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000); Morris v. Slappy, 461 U.S. 1, 13-14 (1983)). The essential purpose of the right to counsel is to guarantee an effective advocate, rather than counsel preferred by the defendant. Carruthers, 35 S.W.3d at 546 (citing Wheat v. United States, 486 U.S. 153, 159 (1988)). Once appointed, counsel should not seek to withdraw unless compelled to do so and with a showing of good cause. Mobley, 397 S.W.3d at 93 (citing Parton v. State, 455 S.W.2d 645, 649-50 (Tenn. Crim. App. 1970)); see also T.C.A. § 40-14-205. "Grounds upon which a trial court may order substitution of counsel include when counsel's

representation is ineffective, when the defendant and counsel have become embroiled in an irreconcilable conflict, or when there has been a complete breakdown in communication between counsel and the defendant." Mobley, 397 S.W.3d at 93 (citing State v. Gilmore, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991)). We note that "the trial court has wide discretion in matters regarding the appointment and relief of counsel, and its action will not be set aside on appeal unless a plain abuse of that discretion is shown." State v. Branam, 855 S.W.2d 563, 566 (Tenn. 1993) (citing State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987)). A reviewing court will not find an abuse of discretion unless "there was no substantial evidence to support the conclusion of the trial judge." Rubio, 746 S.W.2d at 737.

In this case, trial counsel filed a motion to withdraw on November 3, 2010, about two weeks prior to the November 16 trial. At the motion hearing on November 8, counsel explained that since July 2010, the Petitioner and members of his family had lost confidence in counsel's representation. In particular, trial counsel did not want to file certain motions that he considered to be frivolous. During the hearing, the trial court extensively questioned counsel and the Petitioner regarding counsel's representation. The Petitioner conceded that counsel had met with him regularly, conveyed plea offers from the State, discussed trial strategy and defenses, and conducted a complete investigation. When asked whether there were other things that counsel should have done, the Petitioner responded, "No, just motionwise. I've asked to put motions in to see how they turn out." The Petitioner acknowledged that trial counsel had experience in thirty murder trials, and he did not have substitute counsel in mind to represent him. In denying the motion to withdraw, the court relied heavily on State v. Gilmore, 823 S.W.2d 566 (Tenn. Crim. App. 1991), and noted that it could not find specific and sufficient facts to support the withdrawal. The court noted that the case was two years old, and the motion to withdraw was filed on the eve of trial. The court specifically found that counsel's representation was adequate and "entirely within the range of competency[.]"

Based on the record, we conclude that the Petitioner has failed to establish that counsel was ineffective in presenting the motion to withdraw as counsel and in not seeking further review after the denial of the motion. At the post-conviction hearing, trial counsel testified that his relationship with the Petitioner significantly improved after family members and other third parties stopped interfering with his representation. We fail to see what more counsel should have done in arguing the motion to the trial court, or how this issue would have had merit on appeal. Although the Petitioner and trial counsel may have had disagreements, a criminal defendant is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Moreover, "an attorney's good faith assertion of his disqualification is not in itself ineffective representation[.]" Thompson, 768 S.W.2d at 245. Regarding the Petitioner's contention that the trial court clearly abused

-19-

its discretion in denying the motion to withdraw, we conclude that there was substantial evidence in the record to support the trial court's ruling. Therefore, the Petitioner has not demonstrated that he was prejudiced because this issue was not raised on direct appeal. This claim is without merit.

**V. Pretrial Motions.** The Petitioner's next allegation of ineffective assistance of counsel is related to his previous claim regarding the motion to withdraw. He alleges that counsel should have filed numerous pretrial motions concerning significant evidentiary and procedural issues. He asserts that the presentation of these motions "could have resulted in a different outcome" and that counsel's omission "clearly resulted in prejudice."

We agree with the post-conviction court that the Petitioner has failed to establish that trial counsel was ineffective in this regard. Specifically, the Petitioner has not demonstrated how he was prejudiced by counsel's pretrial motion practice. At the evidentiary hearing, the Petitioner did not present any proof or argument to establish a reasonable probability that the filing of the Petitioner's requested pretrial motions would have resulted in a different outcome. Accordingly, he is not entitled to relief on this issue.

**VI. Sentencing.** As his final ground for relief, the Petitioner argues that trial counsel provided ineffective assistance during sentencing. Specifically, he contends that trial counsel should have presented mitigating factors or evidence to support concurrent sentencing; should have objected to the trial court's finding that the Petitioner committed the offenses while on probation; and should have informed the court the reason that the State withdrew its notice of intent to seek enhanced punishment. In rejecting this claim, the post-conviction court found that the Petitioner failed to present any proof of factors that the sentencing court could have considered and that the Petitioner did not demonstrate how counsel's representation was ineffective or deficient during sentencing. We agree that the Petitioner has made an insufficient showing of prejudice based on counsel's performance.

The record reflects that at the sentencing hearing, the Petitioner did not accept responsibility for the offenses, as shown in his statement in the presentence report: "I let someone use my phone and they were involved in the crime of robbery and murder. No involvement, but my cell phone." See Cody Cofer, 2012 WL 3555310, at *14. Officer Danny Williams of the Board of Probation and Parole testified that he interviewed the Petitioner twice, and the Petitioner denied being present during the offenses. At the conclusion of the hearing, trial counsel argued that the court should impose concurrent sentences for the felony murder convictions because consecutive sentencing was akin to life without parole, an enhanced punishment that the State had withdrawn. The Petitioner

then challenged his sentences on direct appeal, and this Court affirmed the trial court's imposition of consecutive sentences. Id. at *24.

At the post-conviction hearing, trial counsel testified that funding for a mitigation expert had initially been approved because the State was seeking an enhanced punishment of life without parole. Counsel stated that he consulted the Petitioner and his family and that it was a matter of trial strategy to accept the State's offer to withdraw its intent to seek enhanced punishment. He conceded that he did not present mitigation evidence at the sentencing hearing. Trial counsel further testified that he did not expect to prevail on the sentencing issue on direct appeal.

At the conclusion of the evidentiary hearing, the court specifically questioned post-conviction counsel regarding whether the lack of proof presented by trial counsel prejudiced the Petitioner at sentencing. The following colloquy occurred:

THE COURT: Ineffective assistance at sentencing, what is the mitigation proof? There is none before this court today. I heard none of what it is that [trial counsel] would have put on in mitigation. If you had called the mitigation specialist, perhaps he would have said to me [the Petitioner]'s eighteen years old at the time, he has an IQ of particular thing, he did this, that, I haven't heard anything about it.

. . . .

I've got no proof in this record that I can rule upon. Bring your witness, bring them to me, show them to me, I don't have any of that. That's the---

[POST-CONVICTION COUNSEL]: [Trial counsel] testified that on appeal he raised three mitigating factors.

THE COURT: And did he raise them when we were sentencing the [Petitioner]?

[POST-CONVICTION COUNSEL]: No.

THE COURT: He raised them to the Court of Criminal Appeals?

[POST-CONVICTION COUNSEL]: Yes.

THE COURT: How would he win, who is it, that proof is not before this court? It wasn't before the Court of Criminal Appeals either. Who is it that

-21-

testified to the three things that he said, here, today? Do you see what I'm saying? I have to be able to see that if someone had testified to that, the court may have ruled differently. I don't have that testimony.

We conclude that the Petitioner has failed to establish a reasonable probability that but for counsel's alleged errors, the results of the sentencing hearing would have been different. To demonstrate prejudice based on trial counsel's failure to present a mitigation expert, the Petitioner should have presented such a witness at the post-conviction hearing. See Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008); see also Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Nor has the Petitioner shown that he was prejudiced by counsel's failure to object to the trial court's finding that he committed the offenses while on probation, given that this Court upheld the separate finding that the Petitioner was a dangerous offender. See Cody Cofer, 2012 WL 3555310, at *22-24; see also T.C.A § 40-35-115(4). Finally, the Petitioner has not shown that he would have received concurrent sentences if trial counsel informed the court of the basis of the State's withdrawal of its notice of intent to seek enhanced punishment. Although the Petitioner complains of counsel's representation during sentencing, the Petitioner has not met his burden of proving his factual allegations by clear and convincing evidence. See T.C.A. § 40-30-110(f). Accordingly, he is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we cannot conclude that the results of the Petitioner's trial and direct appeal were undermined or that the proceedings were fundamentally unfair because of the alleged errors of counsel. See Strickland, 466 U.S. at 670 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."). The Petitioner is not entitled to post-conviction relief, and the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

-22-